# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TOMMY DUKES,      :
            :
     Plaintiff,     :
            :
    v.       :   CIVIL ACTION NO.
            :   1:03-CV-0406-JOF
STATE OF GEORGIA, et al.,   :
            :
     Defendants.   :

## OPINION AND ORDER

This matter is before the court on the motion of Defendants Coweta County, Mike Yeager, Major Blake Adcock, and Jennie Adcock for summary judgment [143] and their motion to exclude the expert testimony of Dr. Robert Greifinger pursuant to Federal Rule of Evidence 702 [146]; the motion of Defendant State of Georgia for summary judgment [148]; the motion of Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C., for leave to file excess pages [142], their motion for summary judgment [150], and their final motion to exclude testimony of Robert Greifinger, M.D., and Michael McGinnis, Ph.D. [151]; the motion in limine of Defendants Miriam J. Burnett and MJB Health Services, Inc., to exclude the testimony of Robert Greifinger, M.D. [153], and their motion for summary judgment [154], their motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26, Federal Rule 37 and 28 U.S.C. § 1927 [219],

their motion to strike, their motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26, Federal Rule 37 and 28 U.S.C. §1927 [220], and their motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26, Federal Rule of Civil Procedure 37 and 28 U.S.C. § 1927 [221]; and Plaintiff's motion to bring additional authority [188], his motion for oral argument [189], and his motion to strike [187] reply to response to motion, argument I [190].[1]

I.      **Statement of the Case**

        A.      **Procedural History**

        On February 12, 2003, Tommy Dukes (hereinafter "Plaintiff") filed suit against Defendants, State of Georgia (hereinafter "Defendant Georgia"), Coweta County (hereinafter "Defendant Coweta"), Integrated Regional Laboratories (hereinafter "Defendant IRL"), E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C. (hereinafter collectively "Defendant Emory"), Sheriff Mike Yeager (hereinafter "Defendant Yeager"), Major Blake Adcock (hereinafter "Defendant Blake Adcock"), Nurse Jennie Adcock (hereinafter "Defendant Jennie Adcock"), Dr. Miriam J. Burnett and Dr. Miriam J. Burnett, P.C. (hereinafter together as "Defendant Burnett"), and Sgt. Bobby Stozier.  Later, on April 28, 2003, Plaintiff amended his complaint to substitute MJB Health Services for Defendant Dr. Miriam J. Burnett, P.C.

        [1]As a preliminary matter, the Court GRANTS Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C.'s motion for leave to file excess pages [142] and Plaintiff's motion to bring additional authority [188].

Plaintiff brought claims against Defendant Stozier for unreasonable seizure and false imprisonment.   On August 31, 2004, the court denied Plaintiff's motion for summary judgment and granted Defendant Strozier's motion for summary judgment.   Pursuant to that order Defendant Strozier was dismissed as a defendant in this action.   At the close of discovery, Defendants filed the instant motions for summary judgment and motions to exclude the expert testimony of Dr. Robert Greifinger and Dr. Michael McGinnis.

### B.    Facts

In setting forth the facts, this court resolves all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determines the legal question of whether various defendants are entitled to judgment as a matter of law.  *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor,* 351 F.3d 1080, 1084 (11th Cir. 2003)).

Plaintiff was arrested by City of Newnan police on February 21, 2001, and booked into the Coweta County Jail.   At the time of his incarceration, Plaintiff was HIV positive; he had been HIV positive for approximately six years.   Upon his incarceration Plaintiff was asked a series of medical questions as part of the booking process in order to identify any existing medical needs.   At that time he did not inform jail personnel that he was HIV positive.

On February 22, 2001, Plaintiff completed a request for medical services complaining that he had "the flu real bad," that he could not breathe, and that he had a "really bad toothache." The next day he was seen by Defendant Jennie Adcock, the head nurse and   infirmary

3

supervisor.  He had a temperature of 102.5 degrees, dry scaly flushed skin, yellow drainage from his nose, a dry cough, and a red throat.  Defendant Jennie Adcock called Defendant Burnett, the jail physician, who prescribed Bactrim (an antibiotic), Robitussin, Tylenol, and Chlor-Trimeton (an antihistamine and decongestant).  Plaintiff took this medication from February 23 to February 27.  On February 27, the medication was discontinued due to an "allergic reaction."

On March 8, Defendant Burnett was at the jail on one of her regular clinic days.  It was Defendant Burnett's custom to be at the jail for four hours one day a week.  At all other times she was on call and able to be reached by jail personnel.  Defendant Jennie Adcock saw Plaintiff on March 8 and reported to Defendant Burnett that Plaintiff's temperature was 99.2 degrees and that he still had a non-productive cough.  Without examining Plaintiff, Defendant Burnett prescribed a different antibiotic, Amoxil.

On March 18, Plaintiff prepared a request for medical services complaining of "Himrods" [hemorrhoids] and that he could not use the bathroom.  He was scheduled to see Defendant Burnett on her next clinical day, March 22.  On March 22, Defendant Burnett personally examined Plaintiff for the first time.  Defendant Burnett noted that Plaintiff had small patches of "macular" rash on his arms.  As a result of this visit she noted "cold symptoms resolving."  She prescribed Anusol for the hemorrhoids.

On April 15, Plaintiff prepared a request for medical services stating, "I have a real bad cold, it never went away.  My hole (sic) body is sore and I break out in sweat.  I can't eat please

4

help me." Defendant Jennie Adcock scheduled him to see Dr. Burnett. Four days later, on April 19, Plaintiff was examined by Defendant Burnett. On April 19, Plaintiff had a fever of 102.9, a rapid pulse, a slightly yellow productive cough (which had started on April 12). Defendant Burnett infused Plaintiff with one liter of I.V. fluids, prescribed Biaxin (an antibiotic) and Tylenol, and ordered a recheck on the following Tuesday, April 24. Further, Defendant Burnett ordered Plaintiff to be sent to the hospital for a chest x-ray and lab work. The x-ray taken on April 19 indicated pneumonia, and the lab work revealed anemia. Plaintiff's symptoms associated with this pneumonia abated within forty-eight hours of his being placed on antibiotics. Plaintiff Ex. 30. Defendant Burnett planned to have another set of x-rays taken in thirty days, the time after a patient starts taking antibiotics that, in her medical opinion, it could take for an x-ray to show clear lungs.

On April 26, a nurse at the jail, Nurse Adams, asked Plaintiff whether he had HIV. Plaintiff admitted that he had been diagnosed as HIV positive in 1995. The same day the information reached Dr. Burnett. Dr. Burnett immediately contacted Positive Response, an organization that evaluates and treats HIV positive patients, and scheduled Plaintiff to have a HIV evaluation on May 30, the first available opening. Defendant Burnett also examined Plaintiff and found that the symptoms of pneumonia had cleared.

On May 4, Plaintiff complained of headaches, lack of appetite, high blood pressure, and an oral thrush, a fungal infection of the mouth and gastrointestinal tract. At this time, Defendant Burnett prescribed a specialized diet and Zantac for the lack of appetite and

AO 72A
(Rev.8/82)

Diflucan for the oral thrush.  She also asked the jail nurses to inquire whether Plaintiff could be seen by Positive Response on an earlier date.   They did so, but Defendant Burnett was informed that no earlier appointment was available.

On May 5, Plaintiff's condition worsened.   On May 6, Plaintiff had a fever of 102.9 and Defendant Burnett immediately sent Plaintiff to the emergency room.   Plaintiff received a chest x-ray.   The hospital radiologist noted improvement in the lung infiltrate with "somewhat of a cavitated appearance" and suggested a continued follow-up examination.   The same day, Dr. Morgan, the emergency room physician who had examined Plaintiff, noted that Plaintiff had a continued, non-productive cough and a scaly erythematous rash on his face.  He noted also that Plaintiff's x-ray showed "persistent scarring or infiltrate in the left upper lobe" of the lung.  In the section of his notes labeled "Plan," Dr. Morgan stated:

> The patient was rehydrated with one liter of normal saline in the Department. He will receive [an antibiotic] in the Department.  Discussed with the jail nurse. She will arrange a follow up with the jail physician.  They will consider a follow up with a pulmonologist.  He has an appointment with an HIV clinic in two weeks.  We will continue Diflucan [for oral thrush]. Antibiotic selection by jail physician tomorrow.

Plaintiff Ex. 21.

On May 10, Defendant Burnett examined Plaintiff.   She noted that he "feels much better" and his oxygen saturation was good.   She checked the x-ray report from the hospital emergency room and noted the indication on the radiologist's report that the infiltrate was improving.   Despite all these positive signs of improvement, Defendant Burnett ordered

6

another chest x-ray to be taken the following day. She examined the third x-ray on May 16 and noted that "there has been no significant interval change of the left upper lobe cavitated lesion."

On May 17, Defendant Burnett noted on Plaintiff's chart that the May 11 chest x-ray showed a cavitary lesion that was the same size as seen on the x-ray of May 6. Yet another x-ray was taken that morning, May 17, and that x-ray gave some indication that the cavity lesion was decreasing. However, because the Patient was HIV positive with a possibly low T-cell count, Defendant Burnett referred Plaintiff to Dr. Patel, a pulmonologist. The same day, May 17, Plaintiff was hospitalized at Defendant Emory because the cavitated appearance on the x-ray raised the prospect of tuberculosis. During this hospitalization, hospital doctors performed a bronchoscopy and lung biopsy to investigate the cavitary lesion. Tests taken while Plaintiff was hospitalized showed that Plaintiff did not have tuberculosis. On May 21, Plaintiff was discharged from the hospital and sent back to the jail. Defendant Burnett testified that she was informed that when Plaintiff had been discharged from the hospital, Plaintiff had told the nurses at the hospital and the detention officer that he would be returning to the hospital because it was comfortable there and he had his own television and he liked the bed.

After the lung biopsy of May 17, samples of Plaintiff's lung were sent from Defendant Emory to be analyzed at Defendant IRL's laboratory. Susan Denford, a technologist for Defendant IRL, noted that two specimens had been taken from Plaintiff's lungs and that both

7

had grown a mixture of bacteria and fungus. In order to isolate and identify the fungus, she prepared a subculture of the fungus only. On May 22 she ran tests on the fungus and found that it was not candida albicans. The information was placed by Defendant Emory on the computer Meditech database which stated that the culture had been identified as a yeast, but not candida albicans. This information was available to Defendant Burnett at a computer terminal at Defendant Emory.

Defendant Burnett checked with Dr. Patel, the pulmonologist, regarding Plaintiff's lab reports, but it is unclear what information she received. There is no indication in the record that she was given any new information concerning the patient. She examined Plaintiff on May 24, her next regular visit to the jail, and recorded that Plaintiff was "doing well." She was not aware of the May 22 lab finding of a pulmonary yeast infection. On May 29, Plaintiff complained of having headaches and vomiting three times since the night of May 28. He did not complain of any respiratory distress. He was placed on "medwatch." When a person is placed on medwatch, the person is placed in a different part of the jail, the booking area, where his condition can be continually monitored. Plaintiff's symptoms were relayed to Defendant Burnett, who prescribed Phenergan for the vomiting and Tylenol for the pain. On May 30, Plaintiff went to his scheduled appointment at Positive Response. As a result of this visit Plaintiff was placed on HIV medications.

On her next regular visit, May 31, Defendant Burnett did not examine Plaintiff. In the afternoon of May 31, after Defendant Burnett had left the jail, Nurse Taylor noted that

8

Plaintiff's blood pressure was still elevated, that he was dizzy, and that the pulse oximeter showed a decrease in blood oxygenation.   However, at this time the chart indicates that Plaintiff's temperature was normal and that his lungs were clear.   Nevertheless, the nurses placed Plaintiff back on medwatch.   A call was made to Defendant Burnett.   Defendant Burnett informed the nurses to keep observing Plaintiff.

Between May 31 and June 7, Plaintiff was observed in the booking area.   On medwatch, the nurses take vital signs more often than usual and keep a closer eye on the patients.   On June 2, the nurses who were checking on Plaintiff noted that he would "not get up from the mat."   On June 3, when checking on Plaintiff, Nurse Adams took his vital signs and noted that his "skin turgor" was good, suggesting that Plaintiff appeared to be hydrated.   On June 4, Nurse Adams noted that Plaintiff would not come to the door to take medication, was urinating on the floor, and was cursing and abusive to the staff.   The same day Defendant Jennie Adcock also observed Plaintiff to be just laying on the mat.   Defendant Jennie Adcock indicated in her deposition that it was not the norm for Plaintiff to urinate on himself or be abusive to the staff.   On May 5, Nurse Adams noted that Plaintiff took his medication in the morning.   On the mornings of May 6 and 7, Nurse Adams noted that Plaintiff did not take his medication.

Throughout this period the nurses observing Plaintiff reported to Defendant Burnett that Plaintiff was intermittently cursing, intermittently refusing medicines and intermittently urinating on himself.   Jail personnel noted that all these actions seemed to occur when it appeared that Plaintiff thought he was being watched.   There is no indication in the record that

9

Plaintiff complained of any pain during this time. Defendant Burnett concluded that Plaintiff was faking in hopes of being placed back in the hospital. Plaintiff was placed in the infirmary on the afternoon of June 6.

Defendant Burnett next examined Plaintiff on June 7 during her regular visit. She noted that Plaintiff had a personality change, with fluctuating personal hygiene, but that he continued to eat and drink and that his vital signs were stable, his pupils reacted to light, and that he was able to pull on her arm with strength despite stating he was without strength. She ordered a head CAT scan for toxoplasmosis, a complete metabolic profile, and a CBC (complete blood count). Moreover, she ordered fungal cultures in the form of a blood culture and urinalysis. In her notes Defendant Burnett stated:

> adverse reaction to dapsone [HIV medication] is most likely diagnosis as have ruled out toxo and other CNS lesions, labs essentially normal. Push fluids and observe. Observed lying flat moving arm to move, gets ice into mouth without dropping it. I also ordered I.V., half normal saline at 125 an hour from one liter and then discontinue all of his medications.

On June 8, Defendant Burnett called the infirmary to check on Plaintiff and was told that he complained of being blind. She directed that Plaintiff be sent to the hospital. In her report dated June 8, Defendant Burnett listed the following symptoms: altered mental status, some incontinence, visual changes, headache that was intermittent, and vision problems. She spoke with Dr. Rosenstock, an infectious disease specialist, and upon his recommendation, she inquired into the lab reports resulting from tests and procedures performed during Plaintiff's May 17 - 21 hospitalization. She learned that the lab work had identified the fungus

10

culture as a yeast, not candida albicans.   On the consultation with Dr. Rosenstock, Defendant

Burnett requested that Defendant IRL test the fungus culture to identify the yeast.   It turned

out to be positive cryptococcus.   A lumbar puncture indicated that Plaintiff was suffering from

cryptococcal meningitis.   As a result of the cryptococcus meningitis, Plaintiff had lost his

vision.

11

### C.      Contentions

In his complaint, Plaintiff contends that Defendants Georgia, Coweta, and all individual defendants are liable for violations of his Fourteenth Amendment rights due to their deliberate indifference to a serious medical need, violations of the Americans with Disabilities Act and the Rehabilitation Act of 1973, and for abuse under the Georgia Constitution.   Further, Plaintiff contends that Defendant Yeager is liable for failure to provide medical services under O.C.G.A. § 42-4-4 and that Defendant Burnett is liable for medical malpractice.   Finally, Plaintiff contends that Defendants IRL and Emory are liable for failing to perform their duty to perform laboratory work with the requisite degree of care.

Three different groups of defendants, (1) Defendants Coweta, Yeager, Blake Adcock and Jennie Adcock, (2) Defendants IRL and Emory,  and (3) Defendant Burnett, contend that Dr. Greifinger's expert testimony should be excluded pursuant to Fed. R. Evid. 702. Defendants IRL and Emory also seek to exclude the expert testimony of Michael McGinnis, Ph.D., pursuant to Fed. R. Evid. 702.

Moreover, Defendant Georgia moved for summary judgment claiming that it was not liable for Rehabilitation Act violations stating that it was not responsible for the action of Defendant Yeager.   Defendants Yeager, Blake Adcock and Jennie Adcock contend that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim.   Defendant Coweta contends that it is entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims and his Fourteenth Amendment claims.   Defendant Burnett avers that she is entitled

12

to summary judgment on Plaintiff's deliberate indifference claim.   Defendants IRL and Emory

contend that they are entitled to summary judgment on Plaintiff's state law negligence claims.

## II.    Discussion

### A.    Expert Testimony

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or

other specialized knowledge will assist a trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education may testify thereto in the form of an opinion or otherwise."   In the

seminal case on the matter, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the

United States Supreme Court held that Rule 702 imposes on judges a special gate-keeping

role, and the Court instructed them to "ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable." *Id.* at 589.   The Supreme Court noted that Rule

702 admits only "scientific knowledge," and not speculation or subjective belief. *Id.* at 590.

"The proponent of expert testimony always bears the burden to show that his expert is

qualified to testify competently regarding the matters he intend[ed] to address; [] the

methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the

testimony assists the trier of fact." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.

2004)

Under *Daubert* 's reliability prong, the Supreme Court listed four factors that courts

should consider when determining whether testimony is reliable:   (1) whether the theory or

13

technique can be tested; ( 2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community.   *Id.* at 593-94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).   These factors are not exhaustive but serve instead as a starting point for the court's analysis.   *Daubert*, 509 U.S. at 593; *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).   When engaging in the reliability analysis, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate.   *Daubert*, 509 U.S. at 595.   The court notes that "presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden.   *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005).   Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."   *Id.* at 1111 (internal quotations omitted).   An expert's unexplained   assurance that his or her opinions rely on accepted principles fares no better.   *McClain v. Metabolife International, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005). When a witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."   *Frazier*, 387 F.3d at

14

1261.  An expert's qualification and experience alone are not sufficient to render his opinions reliable.  *Id.*

Under the second prong of the *Daubert* analysis, the proposed expert testimony also must be relevant.  In order to satisfy this requirement, a court must ensure that the "proposed expert testimony is 'relevant to the task at hand,' . . ., i.e., that it logically advances a material aspect of the proposing party's case."  *Id.* at 591.  The Court has described this prong as an issue of "fit."  *Id.*  The relevance prong is not satisfied where otherwise acceptable evidence is introduced for the wrong purposes.  *Id.*  Likewise, the relevance prong is not satisfied where the proffered testimony does not assist the trier of fact.  *See* Fed. R. Evid. 702.  Further, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *U.S. v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (en banc).  Falsifiability is an important issue in determining the relevance of opinions offered by an expert.  As stated in Daubert:

> a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.  "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry."

In sum, expert testimony may be admitted into evidence if (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the

15

application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).[2]  Finally, the Eleventh Circuit stresses "that the burden of laying the proper foundation for the admission of expert testimony rests with its proponent."  *Cook*, 402 F.3d at 1113.  Accordingly, here the burden rests on Plaintiff.

It is within the court's discretion whether or not to hold a *Daubert* hearing to help decide issues concerning an expert's adequacy to testify.  "*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses."  *Id.*  As neither Plaintiff nor Defendants has requested to be heard concerning the experts, the court declines to hold a *Daubert* hearing.

### 1.    Dr. Greifinger

Three different groups of Defendants have filed motions to exclude the expert testimony of Plaintiff's expert, Dr. Greifinger:  (1) Defendants Coweta, Yeager, Blake Adcock and Jennie Adcock, (2) Defendants IRL and Emory, and (3) Defendant Burnett.  They set forth

---

[2]Plaintiff argues that the court should not try to apply *Daubert* type considerations to more mundane testimony of mainstream experts.  Plaintiff notes that the analysis found in *Daubert* and *Kumho Tire* applied to Rule 702 as it existed prior to its amendment on December 1, 2000.  Plaintiff claims that  the court should rely solely on the 2000 amendment of Rule 702 forsaking a traditional *Daubert* analysis.  The court declines to follow Plaintiff's advice and notes that the Eleventh Circuit has continued to apply *Daubert* and its progeny in determining the admissibility of expert testimony even after Rule 702's amendment.  *See*, *e.g.*, *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092 (11th Cir. 2005).  Accordingly, *Daubert* and its progeny are still binding authority on this court.

16

three arguments as to why Dr. Greifinger's expert testimony should be excluded:  (1) Dr. Greifinger is not qualified to offer expert testimony in this case; (2) Dr. Greifinger's opinions are not reliable; and (3) Dr. Greifinger's opinions are not relevant and go beyond the scope of permitted expert testimony pursuant to Rule 702.

Meanwhile, in support of Dr. Greifinger's expert testimony, Plaintiff contends:

> the overall medical-legal issue is not one of internal medicine nor of infectious disease specialty.  The medical-legal issues are issues created by the unique setting of correctional health care.  Specifically whether the . . . [Defendants' action] . . . demonstrates a deliberate indifference to serious medical needs.  As an expert in the delivery of care in a corrections setting Dr. Griefinger (sic) is eminently qualified as by his *curriculum vitae*.

Pltf. Resp. to Def. Burnett's motion to exclude at 5.   Moreover, Plaintiff states that Dr. Greifinger's testimony is based on reliable principles of corrections health care.   Finally, Plaintiff contends that Dr. Greifinger's testimony will assist a jury.

### a.    Initial matters

Defendants IRL, Emory, and Burnett contend that Dr. Greifinger is not qualified to testify with regard to Plaintiff's state law claims because of new Georgia legislation.

The Eleventh Circuit has held that when evaluating expert testimony in Georgia state medical malpractice claims brought in federal court pursuant to supplemental jurisdiction, the matter is substantive and subject to state law.  *McDowell,* 392 F.3d at 1294-95 (agreeing with *Legg v. Chopra,* 286 F.3d 286, 290 (6th Cir. 2002) ("state witness competency rules are often intimately intertwined with a state substantive rule.   This is especially true with medical malpractice statutes, because expert testimony is usually required to establish the standard of care.").   The court agreed with *Legg* when it mandated that "if a witness is deemed competent to testify to the substantive issue in the case, such as the standard of care, his or her testimony should *then* be screened by Rule 702 to determine if it is otherwise admissible expert testimony."  *McDowell*, 392 F.3d at 1295 (citing *Legg*, 286 F.3d at 292) (emphasis added).

Defendants contend that O.C.G.A. § 24-9-67.1 has changed the standards for competency of expert witnesses in Georgia.   The court agrees.   In a relevant portion this statute states:

> [I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>> (1)  Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and

18

(2)   In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

(A)   The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B)   The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; and

. . . .

(D)   Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician's assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider. However, a nurse, nurse practitioner, certified registered nurse anesthetist, nurse midwife, physician's assistant, physical therapist, occupational therapist, or medical support staff shall not be competent to testify as to the standard of care of a physician.

AO 72A
(Rev.8/82)

O.C.G.A. § 24-9-67.1(c).   Defendant contends that this statute prevents Dr. Greifinger from testifying as to matters of internal medicine, infectious disease, or laboratory procedures because he has not practiced or taught these matters for three of the past five years.   The court finds this statute must be applied and concludes that Dr. Greifinger is not qualified to speak to such matters (internal medicine, infectious disease, or laboratory procedures) with regard to Plaintiff's state law claims.

Plaintiff raises two arguments against the application of the statute to the state malpractice claims in this case.   First, he contends that the statute is not retroactive and thus does not apply to this case.  The court disagrees.  Georgia Laws 2005, Act I § 15, provides:

> (a)  This Act shall become effective upon its approval by the Governor or upon its becoming law without such approval.  (b)  Code Sections 51-12-31 and 51-12-33, as amended by this Act, and Code Sections 51-1-29.5, 51-2-5.1, and 51-13-1, as enacted by this Act, shall apply only with respect to causes of action arising on or after the effective date of this Act, and any prior causes of action shall continue to be governed by prior law.  It is the intention of the General Assembly that all other provisions of this Act shall apply to causes of action pending on its effective date, unless such application would be unconstitutional.

The court notes that O.C.G.A. § 24-9-67.1 was signed into law by the Governor effective February 16, 2005.

20

Next, Plaintiff contends that  O.C.G.A. § 24-9-67.1 does not apply in a federal court and relies on the following language of the statute:

> (f)   It is the intent of the legislature that, in all civil cases, the courts of the State of Georgia not be viewed as open to expert evidence that would not be admissible in other states.   Therefore, in interpreting and applying this Code section, the courts of this state may draw from the opinions of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999); and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases.

The court finds Plaintiff's argument without merit.   The Eleventh Circuit stressed in *McDowell* that when determining the competency of an expert witness in state medical malpractice claims, federal courts first should apply the competency standard under state law. Because this state statute goes directly to the state competency standard, the court first will analyze Plaintiff's state law claims as O.C.G.A. § 24-9-67.1 requires.

### b.      Dr. Greifinger's Qualifications

The court finds that Dr. Greifinger is qualified as an expert to discuss matters of correctional health.   Dr. Greifinger has practiced in the field of correctional medicine for the past sixteen years.   Greifinger Report at 1.   From 1987 to 1989 he managed medical care at Rikers Island.   *Id.*    From 1989 to 1995 he served as Deputy Commissioner/Chief Medical Officer for the New York State Department of Correctional Services.   *Id.*   From 1995 to the present he has been engaged as a consultant in the design, management, and quality

21

improvement of correctional health care systems. *Id.* Such qualifications render Dr. Greifinger as a qualified expert on matters of correctional health.

With respect to Plaintiff's state law claims, it would be inappropriate for Dr. Greifinger to testify as to any matter outside correctional health care. There is no evidence that he has practiced in any field except correctional health care for three of the past five years. Therefore, under O.C.G.A. § 24-9-67.1, he is not competent to testify as to other matters with regard to Plaintiff's state law claims. Specifically, he is not competent to testify as to the standard of care in the fields of internal medicine, infectious disease, or laboratory procedures with regard to Plaintiff's state law claims.

Moreover, applying a Rule 702 analysis, while Dr. Greifinger is an expert on matters of correctional health, he is not an expert in internal medicine, infectious diseases, or proper laboratory procedure. Dr. Greifinger is board certified in pediatrics. Greifinger Depo. at 188. Moreover, he has not provided hands-on medical treatment to any inmates since 1985. *Id.* Dr. Greifinger has never treated a patient with cryptococcus meningitis. *Id.* at 214. Therefore, the court concludes that under Rule 702, it would be inappropriate for Dr. Greifinger to testify as an expert with respect to any claim as to matters in this case except as to aspects of correctional health.

### c.      The reliability of Dr. Greifinger's expert testimony

Defendants contend that Dr. Greifinger's testimony is not reliable.   Defendants contend that Plaintiff and Dr. Greifinger have offered no support as to the reliability for Dr. Greifinger's statements concerning the laboratories.   Moreover, Defendants contend that Dr. Greifinger's theory that earlier treatment of cryptococcal meningitis would have prevented Plaintiff's blindness (1) has not be tested, (2) has not been subject to peer review, (3) has not been assigned a potential rate of error, and (4) is not generally accepted.   Burnett Mot. to Exclude at 14.   Defendants point to specific portions of Dr. Greifinger's analysis of Plaintiff's condition to show that his opinions were unreliable.   As to Dr. Greifinger's findings that the Defendants' actions fell below the standard of care, Defendants contend that Dr. Greifinger makes such conclusions without any discernable methodology, reliable data, or generally accepted standards.   Coweta, et al. Mot. to Exclude at 9.

Plaintiff seeks to rebut these contentions.   With regard to the reliability of Dr. Greifinger's conclusions regarding cryptococcal meningitis, Plaintiff contends that the Defendants' own expert's testimony supports Dr. Greifinger's statements.   Plaintiff states that all of Defendants' experts agree that earlier treatment would have prevented blindness. Therefore, Plaintiff contends that it is inappropriate and specious to attack Dr. Greifinger's testimony as unreliable.

With regard to Dr. Greifinger's comments about the standards of health care in a correctional facility, Plaintiff contends that Dr. Greifinger based his expert testimony on:

23

his own education[,] training and experience, his participation with other correctional health care professionals in writing, speaking and professional organizations, his observations as court appointed monitor for jails across the country, his participation as a member of the National Commission on Correctional Health Care in promulgating and promoting national standards and, as authority, the actual adopted and written standards for correctional health care published by the National Commission on Correctional Healthcare.

Pltf. Resp. to Burnett Mot. to Exclude at 8-9.

The court is unable to find that the opinions set forth in Dr. Greifinger's expert report are sufficiently reliable.   With regard to Dr. Greifinger's statements concerning the standard of care for laboratories, Plaintiff has offered no argument as to why his statements are reliable.   Moreover, in his expert report, Dr. Greifinger himself offered no support for his statements concerning the laboratories.   With regard to his statements about the treatment of cryptococcal meningitis, Dr. Greifinger provides no basis for his conclusions.   While Plaintiff contends that Defendants' own experts support Dr. Greifinger's findings, the issue before the court is what Dr. Greifinger based his conclusions upon.   Dr. Greifinger has cited no support for his conclusions save his experience.   However, Dr. Greifinger has never seen a patient with cryptococcal meningitis.   Greifinger Depo. at 214-15.   Therefore, Dr. Greifinger's theory that earlier treatment of cryptococcal meningitis would have prevented Plaintiff's blindness is without support and unreliable.

With regard to his statements concerning standards for correctional health care, Dr. Greifinger provides little quantifiable support for his conclusions.   In his expert report, except for (i) the third sentence which provides "[w]ith my experience in correctional health care for

more than 16 years, my opinions are to a reasonable degree of medical certainty and based on standards of care for correctional facilities such as the Coweta County Jail," and (ii) a general listing of his background experience in health care, Dr. Greifinger makes no reference to any specific experience or material upon which he relied in making his conclusions.   In fourteen of his sixteen conclusions, Dr. Greifinger states that the actions of various Defendants fall below the standards of correctional health care and demonstrate deliberate indifference to Mr. Dukes' serious medical needs.

However, Dr. Greifinger does not specify what experiences or what standards he relied upon in making any of these determinations.   In order to find Dr. Greifinger's opinion testimony reliable and connected to scientific data, this court would need to take a leap of faith and rely on Dr. Greifinger's *ipse dixit* and assurance that his testimony is based on nationally accepted standards.   Reliance on naked assurances of the purported expert is exactly what the Eleventh Circuit in *Cook* and *McClain* warned against.   Accepting Dr. Greifinger's experience alone as evidence of the reliability of his statements is tantamount to disregarding entirely the reliability prong of the *Daubert* analysis.

25

### d.      The relevance of Dr. Greifinger's expert testimony

With regard to the relevance of Dr. Greifinger's expert testimony, Plaintiff contends:

[J]urors have no first hand knowledge of what goes on in jails day to day.  Dr. Greifinger's testimony is necessary to supply that gap in knowledge.  In order for a jury to determine whether defendants' many failures or decisions not to act, the jury must receive some "education" regarding the meaning of facts, how jail officials could be expected to respond in the face of those facts, and how the unique restrictions and requirements in a jail setting alter or affect how these officers should [act].

Pltf. Resp. to Coweta, et al. Mot. to Exclude at 6-7.  Plaintiff states, "Dr. Griefinger (sic) is the only expert offered who has knowledge[,] experience and training to educate jurors on what barriers, limitations and special circumstances the correctional setting of this medical case presents . . . ."  Pltf. Resp. to Burnett Mot. to Exclude at 7.

However, this court finds that rather than commenting on how Defendants should have acted or what "barriers, limitations and special circumstances the correctional setting of this medical case presents," Dr. Greifinger merely summarizes Defendants' actions with regard to the Plaintiff and concludes that such actions fall below the standards of correctional health care and demonstrate deliberate indifference to Plaintiff's serious medical needs.  Whether or not Defendants were deliberately indifferent is exactly what Plaintiff must prove at trial. The conclusions that Dr. Greifinger asserts are no different from that which Plaintiff's lawyers will argue during their closing statements.  His stamp of approval on the Plaintiff's contentions does nothing to advance a material aspect of Plaintiff's case.  Because Dr.

26

Greifinger's expert testimony contributes nothing to assist the jury, the court finds that it is not relevant and should be excluded under Rule 702.

Accordingly, because the court finds that Dr. Greifinger's expert testimony is neither reliable nor relevant under the *Daubert* analysis, the court concludes that the testimony should be excluded under Rule 702. Therefore, the court GRANTS the motion of Defendants Coweta, Yeager, Major Blake Adcock, and Jennie Adcock to exclude expert testimony of Dr. Robert Greifinger pursuant to Federal Rule of Evidence 702 [146] and the motion in limine of Defendants Miriam J. Burnett and MJB Health Services, Inc., to exclude the testimony of Robert Greifinger, M.D. [153]. Further, the court GRANTS IN PART the final motion of Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C., to exclude testimony of Robert Greifinger, M.D., and Michael McGinnis, Ph.D. [151].

### 2.    Michael McGinnis, Ph.D.

Defendants IRL and Emory also move the court to exclude the expert testimony of Michael McGinnis, Ph.D. Dr. McGinnis gives three basic opinions concerning the Defendant Laboratories' actions. First, it is his opinion that the cryptococcus neoformans could have been identified sooner than it was by the laboratories. Next, he states Defendant IRL should have tested the sample for the cryptococcus neoformans and that the failure to do so was a violation of the standard of care. Finally, Dr. McGinnis opines that Defendant Emory's reporting procedures were below the standard of care.

27

Dr. McGinnis is currently the Associate Director of Clinical Microbiology for the University of Texas Medical Branch.   In that role, he is in charge of the diagnostic mycology laboratory.   He has been employed in this particular capacity since 2003.   McGinnis CV at 1. Dr. McGinnis has been employed by the University of Texas Medical Branch, except for one year, since 1989.

### a.      Dr. McGinnis's Qualifications

Defendant contends that as Dr. McGinnis works in a large hospital laboratory, he is not qualified to speak towards the practices employed in a reference laboratory.    Contrary to Defendants' argument, the court does not find that there is a significant difference between the work done at Dr. McGinnis's laboratory and reference laboratories.   Both facilities take samples from patients and analyze them for different pathogens.   Further, Dr. McGinnis's laboratory sometimes performs identification of samples received from outside sources.

However, the court finds that on the state of this record, Dr. McGinnis is not qualified to speak about the growth rate of cryptococcus neoformans.   In his deposition testimony, Dr. McGinnis has not shown that he has personal knowledge about the growth rates of cryptococci.   He never even cites any specific occasion during which he worked with or identified the yeast.   He states that he has never run any tests to determine the actual growth rate of the yeast.   Finally, he notes that he does not know of any studies that have been conducted to determine the growth rate of crytococcus.   His only knowledge regarding the growth of this yeast seems to come from "chit-chat"  with other mycologists.   He did not

28

reveal in his deposition and has not otherwise informed the court as to the amount of contact these other scientists have had with cryptococcus neoformans.   Thus, while he actually might be very familiar with cryptococcus neoformans, the record does not reflect any such personal knowledge.

Moreover, Dr. McGinnis states that he works in a supervisory capacity.   He is not a technician involved in the identification of yeast.   Rather, he oversees the technicians who identify samples.   While, Dr. McGinnis on occasion may have worked as the actual technician identifying yeast during three of the past five years, the record does not reflect any such work. Therefore, Plaintiff, as the party proffering Dr. McGinnis's opinions, has not met his burden of satisfying the requirements of O.C.G.A. § 24-9-67.1 by showing that Dr. McGinnis has "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given."

### b.    Reliability and Relevance of Dr. McGinnis's expert testimony

Even if the court allowed the Plaintiff to proffer more evidence to show that Dr. McGinnis is qualified to speak to matters concerning a technician's identification of the yeast cryptococcus neoformans, the court finds his opinions do not satisfy the reliability or relevance prongs of *Daubert*.   It appears to the court that Dr. McGinnis did not have sufficient data and information in order to form reliable opinions regarding Defendants' actions.   He does not seem to know what actually was being done at the laboratory.   McGinnis Depo. at

29

115, 125, 134-36.  He states that he does not know how the yeast was transmitted.  He does

not know the conditions under which the yeast was maintained.  He does not know how much

of the yeast was present at any given time.  He states that he does not know the temperature

of incubation, admittedly a factor that would affect a specimen's growth rate.  *Id.* at 70.

Because of an absence of work cards and work sheets, he seems not to have sufficient

information about what was going on in the lab in order to form a valid opinion.  *Id.* at 115,

125, 134-36.  He admits that he does not know whether the sample was checked regularly.

*Id.* at 139.  Finally, he admits that it might not have been possible to identify the yeast before

June 8.  *Id.* at 140.

Further, his opinions are based on an assumption that in more than fifty percent of the

cases there would be enough sample to test for cryptococcus neoformans, on May 22.  *Id.* at

127.   However, even this assumption is based on suppositions concerning the conditions in

the laboratory.  *Id.* at 70.   Dr. McGinnis admits it is possible that on May 22 there was no

cryptococcus present or that there was not enough yeast present to run a test for cryptococcus

neoformans.  *Id.* at 111, 116.  He also states that it would be pure speculation to speak about

the amount of growth of the specimen on May 22.  *Id.* at 144, 145.  He testified that the yeast

identified on June 8 may not have been the same yeast as the one that may have been present

on May 22.  *Id.* at 115.

While Plaintiff may be able to show that Dr. McGinnis is qualified to testify as to the

proper standard of care and what actions should have been taken to meet this standard of care,

his opinions still do not satisfy *Daubert*.   Dr. McGinnis is working on insufficient data to make his conclusions.    He does not know the conditions of the samples or the procedures. Further, his conclusions on the date on which a possible identification of cryptococcus neoformans could be made is based upon many assumptions and suppositions, the truth of which he had not verified and which are not supported in the record.   Finally, Dr. McGinnis's statement that reports should have been made and transmitted also rests on the assumption that there was enough yeast present to identify the cryptococcus.   Moreover, Dr. McGinnis has not even undertaken to discount other possibilities which might have accounted for the lack of growth, the failure to test the sample prior to June 8, or the failure to report the results.   This failure to falsify possible factors shows Dr. McGinnis's lack of methodology.   Because of the lack of methodology, his conclusions will not assist the trier of fact and are therefore not relevant.

For all the above-stated reasons, the reliability and relevance of Dr. McGinnis's testimony have not been demonstrated to the satisfaction of the court.   Because Plaintiff has not met his burden of showing the proffered expert's qualifications and because the expert has not offered a reliable or relevant opinion, the court concludes that his testimony should be excluded under *Daubert* and Rule 702.   Therefore, the court GRANTS IN PART the final motion of Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C., to exclude testimony of Robert Greifinger, M.D., and Michael McGinnis, Ph.D. [151].

**B.      State Actors v. County Actors - Eleventh Amendment Immunity**

Defendants Yeager, Blake Adcock, and Jennie Adcock contend that the Eleventh Amendment's guarantee of sovereign immunity precludes Plaintiff's claims against them.   The Eleventh Amendment to the United States Constitution provides:   "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."    U.S. amend. XI.    While the language of the Eleventh Amendment would seem to bar only those suits brought against a state either by citizens of another state or by citizens of a foreign state, the Supreme Court has interpreted the Eleventh Amendment to bar suits against a state brought by its own citizens.  *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001).   Furthermore, an entity that is considered an "arm of the state" is also immune from suit.  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).

On the issue of whether a sheriff is a state or county actor for purposes of a section 1983 action, the Supreme Court has stated, "the question is not whether [the sheriff] acts for [the state] or [the county] in some categorical, 'all or nothing' manner," but rather, whether the sheriff is acting for the state "in a particular area, or on a particular issue."  *McMillian v. Monroe County,* 520 U.S. 781, 785 (1997).   Therefore, whether a defendant is an "arm of the state" must be assessed in light of the particular function in which the defendant was engaged when taking the action out of which liability arose.  *Manders*, 338 F.3d at 1308.   To determine if a sheriff is an "arm of the state" for Eleventh Amendment purposes while carrying out a

32

particular function, this court should consider four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id*. at 1309. In order to fully understand the factors, the court must examine Georgia law and the relationship between the different actors, most specifically between Sheriff Yeager, the State, and Coweta County.[3] *Id.*

In *Manders*, the court found that the defendant, a sheriff in Clinch County, was an arm of the state and wore a "state hat" in prescribing use of force policy. The Eleventh Circuit in *Manders*, however, noted that "[t]his is not a case of feeding, clothing or providing medical care to inmates which necessarily occur within the jail." *Id.* at 1319. Later, the *Manders* court noted that "Georgia counties have obligations involving the jail structure and inmates' food, clothing, and medical necessities" and that "such duties involve wholly separate and distinct matters from the sheriff's force policy at the jail and his training and disciplining of deputies in that regard." *Id.* at 1322 (emphasis added.) The Eleventh Circuit, when discussing where the sheriff derives its funds, quoted O.C.G.A. § 42-5-2(a) which states, "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any medical and hospital

---

[3]Defendants Blake Adcock and Jennie Adcock are employees of the Sheriff. Their right to Eleventh Amendment sovereign immunity stems directly from the Sheriff's right. Thus, the court will focus its analysis on whether Defendant Yeager, the sheriff, was entitled to sovereign immunity.

33

attention." *Id.* at 1323.  In a footnote discussing this statute, the Eleventh Circuit stated, "[w]e stress that this case does not involve medical care, which counties have a statutory obligation to provide inmates in county jails." *Id.* n. 43; *see also Epps v. Gwinnett County*, 231 Ga. App. 664, 670 (1998); *Cherokee County v. North Cobb Surgical Assocs.*, 221 Ga. App. 496, 499 (1996); *Macon-Bibb County Hosp. Auth. v. Houston County*, 207 Ga. App. 530, 531-32 (1993).

In *Purcell ex. rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1325 (11th Cir. 2005), an inmate's mother sought to hold a sheriff and others responsible for failure to prevent an inmate-on-inmate attack which resulted in injury to her son.  The Eleventh Circuit relied exclusively on the language in *Manders* which stated that "a sheriff's authority and duty to administer the jail in his jurisdiction flows from the State, not [the] County," to support its finding that the sheriff functioned as an arm of the state, not the County, when promulgating policies and procedures governing condition of confinement at the County jail.

Because neither *Manders* nor *Purcell* involved allegations regarding a sheriff's providing of medical necessities to inmates, the court will apply the four factors set forth in *Manders* to determine if a Georgia sheriff qualifies as an "arm of the state" when he does so.

### 1.    How State Law Defines the Entity

The first factor to be applied by this court is how the state law defines the entity. Because the *Manders* decision involved the relationship of a Georgia sheriff to the county and the state, the analysis for how the state law defines the office of the sheriff in this

34

situation is almost identical to the Eleventh Circuit's analysis in *Manders*.   Therefore, the court will provide a brief synopsis of the relevant parts of that opinion.

In *Manders*, the Eleventh Circuit noted:

> [T]he essential governmental nature of [a sheriff's office] is (a) to continue to perform his historical common law duties to enforce the law and preserve the peace on behalf of the sovereign State and (b) to perform specific statutory duties, directly assigned by the state, in law enforcement, in state courts, and in corrections.  Most of those duties are an integral part of the State's criminal justice system and are state functions.

*Manders*, 338 F.3d at 1319.  A sheriff's office is a "separate and independent office" from a county and its governing body.  *Id.*  "Counties delegate no powers or duties to the sheriff." *Id.*  "[The sheriff] and his deputies are not employees of [the] [c]ounty."  *Id.*  Moreover, the Georgia Constitution precludes counties "from having any control of the sheriff's office." *Id.*

Because this case deals with the sheriff's function in maintaining a county jail, the court will analyze this particular function.

> The Georgia Legislature mandates that "[i]t shall be the duty of the sheriff . . . [t]o take from the outgoing sheriff custody of the jail and the bodies of such persons as are confined  therein" and to furnish inmates "medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury."

*Id.* at 1315 (citing O.C.G.A. § 42-4-4(a)(1)-(2)).  A sheriff's "authority and duty to administer the jail in his jurisdiction flows from the state, not the county."  *Id.* (relying on *In re Irvin*, 254 Ga. 251, 253 (1985) ("It is clear that the legislature has vested broad authority in the office of sheriff to administer the jails.")).  With regard to the jail, the court in *Manders*

35

noted that it "is material that the State uses the county jail to incarcerate not only pretrial detainees charged with state offenses . . . but also state offenders serving state sentences after conviction." *Id.*

Nevertheless, when the sheriff, functioning exclusively as a jailer,  provides medical necessities to inmates, some Georgia provisions define him as providing county functions.

> Since 1863, the Georgia Code has provided that sheriffs are "Jailers of the counties." Ga. Code § 331 (1863).  Today, it provides that "sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority."  Ga. Code Ann. § 42-4-1(a) (1997).  Moreover, it is counties that have the "physical custody" of inmates in their jails and are therefore bound to maintain" them, as by furnishing "food, clothing, and any needed medical and hospital attention." *Id.* § 42-5-2(a).

*Manders*, 338 F.3d at 1334 (Barkett, J., dissenting)

While the *Manders* court's application of this factor weighed strongly in favor of a finding that the sheriff was an "arm of the state" in the function of developing a force policy, here, the first factor does not clearly lead to such a finding.  With regard to a sheriff's function as a jailer providing medical necessities to inmates, the court finds that the first factor leans toward a finding that the sheriff is performing a county function.

### 2.    Where the state law vests control

The second factor to apply in determining if an actor is an "arm of the state" looks at where the state law vests control.  As stated in *Manders*, the Governor retains significant control over sheriffs.  *Id.* at 1321 (citing O.C.G.A. § 15-16-26 ("the Governor has broad investigation and suspension powers regarding any misconduct by a sheriff in the performance

36

of any of his duties")).   "Specifically, the Governor may initiate an investigation of any suspected misconduct by any sheriff and may suspend the sheriff."   *Id.*   Such an investigation is funded by the state.   O.C.G.A. § 15-16-26(a).   After such an investigation, "the Governor may suspend a sheriff for sixty days and extend that suspension for thirty additional days."   *Id.* (citing O.C.G.A. § 15-16-26(c)).   The court in *Manders* concluded that this "disciplinary procedure constituted direct, substantial, and immediate state control over the sheriff's acts." *Id.*

However, at this point the analysis of the sheriff's functions diverges from the situation in *Manders*.   Unlike the development of a force policy as discussed in *Manders,* it is the Georgia counties which have obligations "to maintain the inmate, furnish him with food, clothing, and any needed medical and hospital attention."   O.C.G.A. § 42-5-2(a).   These functions are carried out through the sheriff.   Further, O.C.G.A. § 15-12-71(c) and O.C.G.A. § 15-12-78 provide county governing authorities some oversight of a sheriff's operations at a jail through the investigative powers of grand juries which must inspect jails annually and make appropriate recommendations to the county commission.

While the application of this factor arguably may lean toward a finding that the sheriff, even when providing medical necessities, acts as an "arm of the state," the analysis is not nearly as clear as the sheriff's function addressed in *Manders*.   Moreover, in applying this factor, even the majority in *Manders* recognized that "Georgia counties have obligations

37

involving the jail structure and inmates' food, clothing, and medical necessities . . . ."

*Manders*, 338 F.3d at 1322.

### 3.    Funds

O.C.G.A. § 42-5-2(a) provides:  "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention."  In *Manders*, the court found that this statute was not dispositive to the force policy under consideration. The court reached this conclusion with the following caveat:

> We stress that this case does not involve medical care, which counties have a statutory obligation to provide to inmates in county jails.  O.C.G.A. § 42-5-2. *See, e.g., Epps v. Gwinnett County,* 231 Ga. App. 664, 670, 499 S.E.2d 657 (1998) (Gwinnett County contracted with Prison Health Services, Inc.); *Cherokee County v. North Cobb Surgical Assocs.,* 221 Ga. App. 496, 499, 471 S.E.2d 561 (1996); *Macon-Bibb County Hosp. Auth. v. Houston County,* 207 Ga. App. 530, 531-32, 428 S.E.2d 374 (1993) (concluding Houston County owed hospital for medical care provided to inmate in county jail).

This limitation, coupled with the clear language of O.C.G.A. § 42-5-2(a), leads this court to conclude that when providing medical necessities to inmates, the sheriff derives his funds from the county.

### 4.    Liability for and Payment of Adverse Judgments

This court now turns to the analysis of the fourth factor:  what entity is liable for and payment of adverse judgments. When *Manders* applied this factor, the court found that neither the county not the state must pay directly for judgments against a sheriff in his official

capacity without looking at the sheriff's particular function at issue in the case. Both county and state funds were implicated in replenishing the sheriff's budget after it had been drained by an adverse judgment. The court concluded that the fourth factor did not outweigh the strength of the first three factors, which leaned heavily toward the sheriff functioning as an "arm of the state" when developing a force policy.

Here, unlike the situation in *Manders*, the court finds that as to a sheriff's duty to provide medical necessities to inmates, the first three factors do not suggest that he is acting as an arm of the state. This court's application of all four factors used to determine if an entity is an "arm of the state" for Eleventh Amendment purposes, coupled with the *Manders* court's strong reservations regarding medical necessity cases, lead this court to conclude that Defendant Yeager was not acting as an "arm of the state" when caring for the medical needs of Plaintiff. Therefore, the sheriff is not entitled to sovereign immunity in his official capacity.[4]

---

[4] In his reply brief to the motion for summary Judgment, Defendant Yeager raised an argument that he was entitled to sovereign immunity for any state law claims both in his official and individual capacity. The argument was not raised in Defendants' original motion for summary judgment. Plaintiff brought a motion to strike pages 2 through 6 of Defendants' reply claiming that Defendant's action of raising the argument for the first time in his reply brief is improper. As the court has already concluded that Sheriff Yeager was not acting as an arm of the state and not entitled to immunity, the harm of addressing the argument raised in Defendants' reply is not detrimental to the Plaintiff. Therefore, the court DENIES AS MOOT Plaintiff's motion to strike.

Defendant Georgia has moved for summary judgment on the grounds that Defendant Yeager was acting as an arm of the county and any Rehabilitation Act claim is properly against the county.   Plaintiff agrees.   Because the court has found that Defendant Yeager was acting as an "arm of the county," the GRANTS Defendant State of Georgia's motion for summary judgment.

AO 72A
(Rev.8/82)

C.        ADA / Rehabilitation Act Claims

Plaintiff claims that several actions by jail personnel violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. §§ 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C.A. §§ 701, *et seq.*  Specifically, he states that jail personnel violated the Acts when they (1) told other inmates of Plaintiff's status as an HIV infected person, (2) transported Plaintiff to the hospital without a mask, (3) initially failed to send Plaintiff to the hospital because of his HIV status, (4) failed to provide for food, water and hygiene for several days while Plaintiff was sick, and (5) dragged Plaintiff down the hall in a blanket.  Defendant Coweta County has moved for summary judgment on Plaintiff's claims arguing that Plaintiff cannot show that Defendant Coweta County intentionally discriminated against him due to any alleged disability.[5]

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entities." 42 U.S.C. § 12132.  Similarly, under section 504 of the Rehabilitation Act, "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be

---

[5]Only Defendant Coweta County can be liable for any alleged violations as there is no individual liability under either the ADA or Rehabilitation Act. *Badillo v. Thorp*, 2005 WL 3249481 at *2 (11th Cir. 2005) (Slip Op.).

41

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

To prove a claim under Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability, (2) that he was excluded from the participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by the public entity, (3) by reason of his disability. *See Miller v. King*, 384 F.3d 1248, 1265 (11th Cir. 2004). The elements under the Rehabilitation Act are substantially the same.

Prisons and jails are public entities covered by the ADA. *See, e.g., Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998). Plaintiff is a "qualified individual with a disability" because the Supreme Court has ruled that HIV infection, even in its asymptomatic form, can be a disability under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624 (1998).[6]  The court must determine, then, whether Plaintiff was denied the benefits of services, programs, or activities, and whether such a denial was based on Plaintiff's HIV status. The court will

---

[6]The court recognizes that there is a danger of reading *Bragdon* too far. In fact, the Eleventh Circuit has intimated that HIV status should not be considered a disability *per se* and that disability must be determined on an individual case-by-case basis. *See Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 n.4 (11th Cir. 2001). Furthermore, *Bragdon* determined that a female plaintiff was disabled because her HIV status impaired a major life activity of her reproduction. Obviously, that analysis would be different here as Plaintiff is a male. In any event, because the court determines that Plaintiff's disability claims fail for other reasons, the court will assume for the purposes of argument that Plaintiff is disabled due to his HIV status.

address each of the alleged violations in turn. Because the nature of these violations is contested pursuant to Defendant Coweta County's motion for summary judgment, the court will resolve all issues of material fact in favor of Plaintiff and then, under that version of the facts, will determine the legal question of whether Defendant Coweta County is entitled to judgment as a matter of law. *McDowell*, 392 F.3d at 1288 (citing *Durruthy v. Pastor,* 351 F.3d 1080, 1084 (11th Cir.2003)).

First, Plaintiff claims that jail personnel violated the ADA and Rehabilitation Act when Officer Angel and others allegedly told other inmates of Plaintiff's status as an HIV infected person. Plaintiff, however, has not argued that this disclosure denied him the benefits of any program or service or that it discriminated against him. Therefore, the court concludes that the officer's disclosure violated neither Title II of the ADA nor the Rehabilitation Act.

Next, Plaintiff claims that when Officer Cox transported Plaintiff to the hospital without a mask because of his HIV status, he violated both the ADA and the Rehabilitation Act. Even assuming that Officer Cox did not place a mask on Plaintiff when he was being transported to the hospital, Plaintiff has not explained how the failure to place a mask on him denied him the benefits of any program or service or discriminated against him. The mask would have been placed on Plaintiff for the protection of others, not Plaintiff, because at that time the jail's medical personnel feared Plaintiff might have tuberculosis. Therefore, the court cannot conclude that Defendant's action violated either the ADA or the Rehabilitation Act.

43

Plaintiff next claims that Defendants violated the ADA and the Rehabilitation Act when they failed to send him immediately to the hospital.   Specifically, Plaintiff contends he was discriminated against in his treatment because he would have been sent straight to the hospital if he had been suffering from any other condition.   Transportation can be construed as a program or service provided by the public entity.   *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (holding that transportation of arrestee to police station is "service" of police under the ADA).

Plaintiff's contention, however, is without any support in the record.   Plaintiff has not presented any evidence to show that non-HIV patients routinely are sent immediately to the hospital for any and all ailments or even for ailments such as his.   Defendant Yeager testified that the decision as to whether or not to send a patient to the hospital or to a specialist is left to the discretion of Defendant Burnett.   Defendant Burnett thought that she was not allowed to send Plaintiff, or any other prisoners, to specialists outside the county.   Even assuming for the purposes of this motion that the county failed to make sure that Defendant Burnett knew that she was not under such constraints, that alleged failure does not exhibit any sort of discrimination against Plaintiff due to his disability; rather, it simply shows that Defendant Burnett made this error with respect to all prisoners.   Thus, the failure immediately to send Plaintiff to the hospital does not violate either the ADA or the Rehabilitation Act.

Plaintiff contends that Defendant's employees dragged Plaintiff down the hall in a blanket.   Assuming for purposes of this motion that in fact they did so, Plaintiff has failed to

44

present any evidence that this action was motivated by Plaintiff's HIV status. Without any showing that Defendant's actions were taken on the basis of Plaintiff's disability, Plaintiff has failed to show a violation of either the ADA or the Rehabilitation Act.

Finally, Plaintiff complains that Defendant's conduct violated the ADA and Rehabilitation Act when, during the period between June 1 and June 7, Defendant's employees failed to provide Plaintiff with food, water and hygiene. Plaintiff contends that he was too sick to eat and that no one responded to his cries for water. Moreover, Plaintiff contends that Defendant failed to provide him with clean clothes and blankets and let him lie in his own urine.

As with his other claims, however, Plaintiff has not proffered any evidence to show that Defendant's employees refused to assist him with eating and using the toilet or failed to provide him water because of his HIV status. For example, Plaintiff has not alleged that other non-HIV inmates, ill to the point of not being able to get out of bed, were assisted in this manner by Defendant's employees. Plaintiff, essentially is arguing that prison officials failed adequately to meet his needs, not that prison officials discriminated against him on the basis of his HIV status. Failure to meet needs, however, is more appropriately addressed through the Eighth Amendment. *See*, *e.g.*, *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (ADA addresses disabled person's rights regarding access to programs and services enjoyed by all, but does not provide a general cause of action to challenge manner of medical treatment for underlying disability). In fact, as discussed above, Plaintiff did raise an Eighth

45

Amendment claim against certain Defendants with respect to the jail's failure to provide food, water, and assistance in using the toilet facilities.   Because Plaintiff has proffered no evidence to show that Defendant's actions were taken on the basis of Plaintiff's disability, Plaintiff has failed to show a violation of either the ADA or the Rehabilitation Act.

Therefore, the court GRANTS Defendant Coweta County's motion for summary judgment with respect to Plaintiff's ADA and Rehabilitation Act claims.

### D.      Deliberate Indifference

Several Defendants claim that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claims of denial of due process due to Defendants' deliberate indifference to his medical needs.   A pretrial detainee's due process rights under the Fourteenth Amendment may be violated by governmental actors who act with deliberate indifference to the detainee's serious medical needs.   *See Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).[7]   In order to prove a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective test.   *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003).   First, a plaintiff must demonstrate the existence of an objectively serious medical need.   *Id.*   Second, a plaintiff must prove that a jail official acted with an attitude of deliberate indifference to that medical need.   *Id.*   A showing

---

[7]Although a pretrial detainee's rights flow from the Fourteenth Amendment, the standard for deliberate indifference to medical need is the same as that set forth in cases analyzing a convicted prisoner's claims under the Eighth Amendment.   See *Lancaster*, 116 F.3d at 1425 n.6.

AO 72A
(Rev.8/82)

of deliberate indifference has three components:  (1) subjective knowledge on the part of the jail official that there is a risk of serious harm; (2) disregard of that risk; and (3) doing so by conduct that is more than mere negligence.  *Id.* at 1245.  An official can act with deliberate indifference and not simply negligence, when he fails or refuses to obtain medical treatment for an inmate.  *Id.* at 1246.  A delay in the provision of medical treatment can also constitute deliberate indifference when, for example, a defendant delays provision of treatment for non-medical reasons.  *Id.*

When an inmate has received medical care, courts are reluctant to find deliberate indifference.  *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).  Nevertheless, this reluctance does not mean that a physician's treatment cannot manifest deliberate indifference to an inmate's medical needs.  The Eleventh Circuit has noted that while it was generally hesitant to find an Eighth Amendment violation when an inmate had received medical care, it would have no hesitation in finding that "grossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference." *Id.*

An Eleventh Circuit case that is especially instructive for the case before this court is *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999).  To understand the principles set forth in *McElligott*, the facts presented therein need to be set forth in some detail.  In *McElligott*, the Eleventh Circuit addressed the issue of whether the care received by an inmate was so inadequate that defendants violated the Eight Amendment.  In *McElligott*, Thomas Elmore was incarcerated on August 4, 1996.  *Id.* at 1251.  Upon entry into the prison system, Mr. Elmore

informed the head nurse that he had been experiencing burning abdominal pains for approximately five months.  *Id.*  Over a period of six months, Mr. Elmore submitted various complaints to the prison's head nurse, Nurse Wagner, and the prison's part-time doctor, Dr. Foley.   On August 4, Mr. Elmore began experiencing severe abdominal pain, vomiting, and nausea.   On August 10, Dr. Foley prescribed a liquid diet and Pepto-Bismol for the prisoner. On September 1, the prisoner  had severe intestinal pain and had vomited several times. Despite not having examined the prisoner, Dr. Foley prescribed Tylenol for pain and Pepto-Bismol for vomiting, nausea, and diarrhea.   On September 3, Dr. Foley examined Mr. Elmore and found him to suffer severe  abdominal pain when touched.   Dr. Foley ordered blood work done and prescribed Bentyl (an anti-gas medication).   He also requested a copy of Mr. Elmore's records from his prior treatment at the Veterans Administration hospital in Atlanta.

After his prescription for Bentyl had run out on October 22, Mr. Elmore again complained that his stomach pain was getting worse.   On October 23, Dr. Foley examined Mr. Elmore again.   He placed him on Bentyl again and ordered a urinalysis and a follow-up examination if Mr. Elmore did not improve.   Despite constant complaints, Dr. Foley did not see Mr. Elmore again until December 3.

Between November 27 and December 1, the prisoner wrote Dr. Foley twice, begging him for medication to relieve pain.   Dr. Foley examined Mr. Elmore on December 3 and prescribed Bentyl again.   Dr. Foley did not conduct or order any tests and indicated that he was waiting for Mr. Elmore's prior hospitalization records which had not yet come.   On December

48

29, the prisoner filled out an inmate medical request form stating that he was having muscle spasms and gas and that the Bentyl was not as effective as it had been.  Dr. Foley did not examine Mr. Elmore again until January 9, 1997; although Dr. Foley noted that the Bentyl was not working well anymore, he continued to prescribe it.  On January 21, the prisoner again wrote a request for medical attention because his condition seemed to be worsening and he could not eat.  He stated that he had already lost fifteen pounds.  He wrote to his daughter in an effort to get help.  She contacted the hospital.  The prisoner was next seen by Dr. Foley on January 28.  Dr. Foley did not order any tests.  Believing that Mr. Elmore might have ulcers, Dr. Foley treated him with Prilosec.

On February 2, Mr. Elmore was brought to the prison medical center and examined by the head nurse.  On February 4, Dr. Foley examined Mr. Elmore for the first time with the benefit of the VA records which had recently arrived and noted that the prisoner was in severe pain and dehydrated, that he had lost almost 20 pounds in the last two months, and that he had a possible diagnosis of cancer.  The next day Dr. Foley ordered a CT scan and a chest x-ray of the prisoner.  He chose to wait until the results of those tests to take any further action. On February 10, after test results revealed an intestinal obstruction, the prisoner was hospitalized. The next day Mr. Elmore was prematurely released from jail; he was discharged from the hospital without further diagnosis two days later.   Several days later he was admitted to another hospital and diagnosed with terminal colon cancer.

The *McElligot* court overturned a district court's grant of summary judgment and found that there was sufficient evidence from which a jury could conclude that Dr. Foley had requisite subjective knowledge of a substantial harm. The court found that whether the care received by an inmate was so inadequate that defendants violated the inmate's Eight Amendment rights was a close question. Despite all of the evidence before the court, the Eleventh Circuit agreed with the district court that Dr. Foley and Nurse Wagner could not be held liable for failing to diagnose the prisoner's colon cancer. The court noted that while this failure to diagnose could be deemed extremely negligent, it did not cross the line into deliberate indifference. Nevertheless, the Eleventh Circuit concluded that there was sufficient evidence to permit a jury to conclude that the defendant doctor and nurse were deliberately indifferent to the prisoner's medical need for further diagnosis of and treatment for the severe pain he was experiencing. It stated:

> Despite Elmore's condition, a jury could conclude that, rather than try to diagnose and treat Elmore's worsening condition, the defendants knowingly took an "easier but less efficacious course of treatment," *Waldrop*, 871 F.2d at 1035, reflecting their deliberate indifference to the pain and suffering he was experiencing. Even the care they did provide often came after significant delays. For example, Elmore often had to wait in great pain in order even to be seen by Dr. Foley. A jury could find that these delays evidence the defendants' deliberate indifference. Finally, a jury could also find deliberate indifference in defendants' failure to do anything to alleviate Elmore's pain or even monitor his condition from February 5-February 10, 1997, when Dr. Foley finally decided to order much-needed and long-overdue testing for Elmore.

*Id.* at 1258.

50

Here, Plaintiff contends that both Defendant Burnett and Defendant Jennie Adcock were deliberately indifferent to Plaintiff's serious medical needs. The court will analyze the Plaintiff's claims with regard to each Defendant to determine if their actions rose to deliberate indifference.

### 1.    Dr. Burnett

The crux of Plaintiff's case alleging deliberate indifference on the part of Defendant Burnett is for the failure correctly to diagnose Plaintiff's lung infection as cryptococcus. Alternatively, Plaintiff contends that delays in the treatment constitute deliberate indifference. As Defendant Burnett has moved for summary judgment contending that she was not deliberately indifferent, the court will address each of Plaintiff's claims of deliberate indifference chronologically in order to determine the merit of each claim.

As a first step, the court notes that the parties in the case before this court do not dispute that Plaintiff's condition constituted a serious medical need. Therefore, the court moves on to determine whether Defendant Burnett was deliberately indifferent to Plaintiff's medical needs.

The first requirement of deliberate indifference requires a subjective knowledge on the part of the prison official that there is a risk of serious harm. The court finds that prior to April 19, there is not even circumstantial evidence that Defendant Burnett had subjective

51

knowledge of any significant risk.   The only symptoms complained of or manifested by the prisoner related to flu, a cold, and hemorrhoids.[8]

When Dr. Burnett examined the Plaintiff on April 19, she did not ignore Plaintiff's condition; rather, she prescribed an antibiotic for Plaintiff's pneumonia, and she ordered a chest x-ray and lab work.   The court finds that this treatment shows that Defendant Burnett did not disregard a risk of serious harm.   Moreover, at that time Defendant Burnett indicated that the prisoner would have another x-ray in thirty days to see if the pneumonia had cleared.

On April 26, Defendant Burnett first learned of the substantial risk posed by Plaintiff's HIV positive status.   Upon learning of this risk, Defendant Burnett set up an appointment with Positive Response for an HIV evaluation at its first available opening, albeit a month later.   It should be noted that at that time Plaintiff was not complaining of any pain or discomfort and that his pneumonia symptoms appeared to be responding to the antibiotics started two days earlier.   While it might have been negligent not to have tried to schedule an earlier outside consultation with another HIV treatment group, this court, relying on *McElligott's* finding that the defendants in that case did not exhibit deliberate indifference by  failing to diagnose the colon cancer at an earlier time, finds that this action was not tantamount to deliberate indifference.   Further, when Plaintiff was seen at Positive Response, he was given HIV medications.  The outside group did not recommend further testing or procedures.

---

[8]Plaintiff, although aware of his HIV status, had not revealed his condition to any Defendant or other member of the prison staff.

52

On May 4, when Plaintiff complained of headaches, lack of appetite, high blood pressure, and had an oral thrush, Defendant Burnett responded that same day with treatment for all of the symptoms.  At this point Defendant Burnett also sought an earlier appointment for Plaintiff at Positive Response.

When on May 6, Plaintiff's condition worsened, that day Defendant Burnett had him sent to the emergency room.  The hospital radiologist indicated that a chest x-ray revealed "an improvement of the lung infiltrate with somewhat of a cavitated appearance."  The ER doctor noted on the x-ray a "persistent scarring or infiltrate in the left upper lobe."  Plaintiff received treatment at the hospital.

Defendant Burnett saw Plaintiff again on May 10.  Plaintiff contends that this four-day delay constitutes deliberate indifference.  The court, however, finds otherwise.  Plaintiff had received treatment as set forth by the hospital physicians.  Dr. Burnett did not act with deliberate indifference by waiting to see Plaintiff on May 10.  Moreover, Plaintiff's chart indicates that the patient indicated on May 10 that he felt much better.  Despite this assurance, Defendant Burnett ordered another chest x-ray.  The x-ray was taken on May 11, and Defendant Burnett reviewed the x-ray on May 16.  Plaintiff contends that this delay also constitutes deliberate indifference.  Again, the court finds otherwise.  Plaintiff had told Defendant Burnett that he felt better.  Moreover, Dr. Burnett took anther x-ray and examined it before she saw Plaintiff again.  Again, while arguably it might have been negligent not to

53

have checked the x-ray sooner, such action could not rise to deliberate indifference especially in light of the fact that Plaintiff was feeling better, not worse.

On reviewing Plaintiff's May 11 x-ray and an x-ray taken the morning of May 17, Dr. Burnett noted that the cavitary lesion was decreasing, but once again she took an extra step; she hospitalized Plaintiff again to run more tests including a bronchoscopy and a tuberculosis test. Such action weighs strongly against a finding of deliberate indifference. Here, Plaintiff contends that Defendant Burnett was deliberately indifferent for failing to test for the cryptococcal antigen after Defendant learned Plaintiff did not have tuberculosis. Noting the Eleventh Circuit's holding in *McElligott*, the court finds this unintended failure to diagnose not to be deliberate indifference to Plaintiff's medical needs. What Plaintiff sets forth here is at best a negligence argument.

Plaintiff contends that Defendant Burnett was deliberately indifferent in not obtaining the results of the bronchial fungus cultures before June 8. All of Plaintiff's arguments with regard to the failure to seek out the results of the testing suggest negligence or, at worst, gross negligence. However, they do not evince any deliberate indifference. In order for Plaintiff to show deliberate indifference, he would have to show that Defendant Burnett knew of a substantial risk and chose to ignore it. Here, the Defendant's failure to seek out the results of Plaintiff's fungus cultures does not meet this requirement. There is no evidence, direct or circumstantial, that Defendant Burnett knew that Plaintiff had a fungal infection. The

54

argument that she should have known is more compatible with a negligence argument or a failure to diagnose argument similar to the one rejected in *McElligot*.

Moreover, in *McElligot*, Dr. Foley did not review Mr. Elmore's medical records until they had arrived, five months after the initial request, and with the aid of those charts he reached a diagnosis of possible cancer. Nevertheless, the court found that he was not deliberately indifferent for failing to diagnose the cancer earlier. Similarly, the court does not find Defendant Burnett's failure (for a much shorter time period than in *McElligot*) to obtain the test results and diagnose Plaintiff to constitute deliberate indifference.

Plaintiff contends that Defendant Burnett was informed between May 29 and May 31 that Plaintiff was vomiting and had headaches. However, he did not complain of any respiratory distress. Defendant Burnett did not ignore the complaints, but rather responded with medication for the pain and nausea. Plaintiff went to his appointment at Positive Response on May 30, and he was placed on HIV medications. On May 31, Defendant Burnett did not examine Plaintiff, but he had been seen the previous day at Positive Response. Later in the day, Defendant Burnett was informed that Plaintiff's blood pressure was still high, that he was still dizzy, and that Plaintiff had decreased oxygenation and was placed back in medwatch. She informed the nurses to keep observing Plaintiff.

Assuming for the sake of argument that Defendant Burnett's failure to diagnose the cryptococcus was negligent or even severely negligent, her actions and treatment of Plaintiff cannot be called deliberately indifferent. The failure to diagnose, even something as critical

55

as colon cancer, is not deliberate indifference.   Rather, deliberate indifference stems from ignoring a patient or a failure to treat.   Here, Plaintiff was receiving treatment for his symptoms and his underlying illness, HIV.   While in hindsight it appears that the lesion shown by the x-rays was in fact cryptococcus, there is nothing in the record that indicates Defendant Burnett was ever aware of this severe risk.

Considering the evidence in a light most favorable to the Plaintiff, the court finds that prior to April 19, Defendant Burnett had no knowledge of a substantial risk.   After learning of the risk posed by Plaintiff's HIV positive status, Defendant Burnett took steps to respond to the risk; she responded to each of Plaintiff's complaints and sought to treat each symptom. She often took extra steps even where there was improvement in Plaintiff's condition. Although some of her actions arguably might have been negligent, none rose to the level of deliberate indifference.[9]   Having examined all of Defendant Burnett's acts which allegedly constitute deliberate indifference and finding otherwise, the court GRANTS Defendant Burnett's motion for summary judgment.

## 2.   Nurse Adcock

Plaintiff also contends that Defendant Jennie Adcock was deliberately indifferent to Plaintiff's serious medical need.   Plaintiff addresses several instances which he contends are

---

[9]The court does not find or even suggest that Defendant Burnett's treatment of Plaintiff was negligent.   Rather, the court only indicates that _one_ _could_ _argue_ that certain of her actions or failures to act were negligent.

AO 72A
(Rev.8/82)

evidence of deliberate indifference to serious medical need. Plaintiff's stated serious medical need throughout this period was his status of being HIV positive coupled with his pneumonia.

Plaintiff complains that he was scheduled to meet with Positive Response one month after he informed the medical staff of his status of being HIV positive. Specifically, Plaintiff points to Defendant Jennie Adcock's failure to check whether such a wait would be injurious to Plaintiff's health. As addressed above, while the wait of one month before being seen by the clinic arguably might be considered negligent, the court does not find that it was deliberately indifferent to Plaintiff's condition. Plaintiff was scheduled to be seen at the first available appointment at Positive Response. Plaintiff has not presented any evidence that an earlier appointment at Positive Response would have made any difference. Positive Response put Plaintiff on HIV medications but did not otherwise alter his treatment. Moreover, Plaintiff received constant medical treatment and monitoring, including two hospitalizations, during the time period between his revealing his HIV status and his appointment at Positive Response. He was not ignored during that time.

Next, Plaintiff alleges that nothing was done for him between the days of May 21 and May 24 when he was examined by Defendant Burnett and between May 24 and May 29, when he was placed on medwatch. However, it is unclear from the record that Plaintiff had any complaints which were not addressed during those periods. In fact, on May 24 Defendant Burnett noted that Plaintiff was "doing well." In contrast to the situation presented in the

AO 72A
(Rev.8/82)

*McElligott* case, Plaintiff here does not contend that during these time periods in which he allegedly did not receive medical treatment he had unaddressed symptoms or significant pain that went untreated.  Therefore, the court cannot find that Defendant Jennie Adcock acted with deliberate indifference toward Plaintiff during these periods.

The last period during which Plaintiff contends that Defendant Jennie Adcock was deliberately indifferent to the risks of Plaintiff's medical condition was between the dates of June 1 and June 7.  Between those days Plaintiff would not get up from his mat, was urinating on his mat, and was cursing at the staff.  The important question for this period starts with Defendant Jennie Adcock's subjective mental state.

The first questions relate to whether Defendant Jennie Adcock was aware of the change in Plaintiff's behavior and, if so, the extent of the change.  Moreover, simple awareness of a change of behavior does not constitute deliberate indifference; the court must ask whether the change in behavior was such that it warranted additional action by the jail nurse.  Defendant Jennie Adcock stated that she observed Plaintiff on June 4.  Plaintiff at this time was on medwatch.  She states that at that time she noted Plaintiff was not moving about, but rather was lying on the mat.  She states she was informed about his urinating and about his abusive behavior.  Plaintiff has not attempted to explain nor has he presented any expert authority which would lead this court to find that this different behavior (without further changes in Plaintiff's vital signs or physical condition and with no indication of pain) should be seen as a change that would indicate to a non-physician a serious medical risk.  Therefore, the court

58

cannot conclude based on this information that Defendant Jennie Adcock had substantial knowledge of a serious medical risk on June 4 when she observed Plaintiff. Moreover, even if the change in behavior could be deemed to constitute a serious risk, some action was taken. The doctor was informed of Plaintiff's behavior. While it is not clear who informed Defendant Burnett, she states that she received information that Plaintiff would not get up from his mat, intermittently urinated on the floor or mat, and intermittently refused medication. Further, there is no indication in the record that Defendant Jennie Adcock was told or otherwise received information that Plaintiff refused his medication all but once between June 5 and 7. She cannot be held to be deliberately indifferent to Plaintiff's refusal of medication if she had no knowledge of the behavior.

Having examined Defendant Jennie Adcock's actions toward Plaintiff for the time periods in question, the court finds that Defendant Jennie Adcock responded to all requests for medical service. She conveyed requests and relevant information to Defendant Burnett. Based on Defendant Jennie Adcock's actions as set forth in the record, the court cannot conclude that she was deliberately indifferent to a risk of serious harm to Plaintiff during the period between June 1 and June 7. Therefore, the court GRANTS Defendant Jennie Adcock's motion for summary judgment with respect to Plaintiff's Fourteenth Amendment claim for deliberate indifference.

59

**E.      County Liability**

Defendant Coweta has moved for summary judgment on Plaintiff's section 1983 claims.[10]    Plaintiff contends that Defendant Coweta is liable under 42 U.S.C. § 1983 for deliberate indifference to his medical needs and has put forth several different theories in support of this contention.    Plaintiff contends that county policies which subject the county to liability were (1) the sheriff's inadequate screening policies, (2) the jail's inadequate record-keeping process, (3) the policy of the jail that an inmate cannot be transported out of the county for medical care, (4) the policy of maintaining inadequate staffing of medical personnel at the jail, and (5) Defendants Yeager, Blake Adcock, Jennie Adcock, and Burnett's failure to train and supervise.

The Eleventh Circuit has recently reviewed section 1983 claims against a Georgia county wherein an inmate asserted that county policies constituted and resulted in deliberate indifference to his medical needs.  *McDowell,* 392 F.3d at 1283.   Because this decision is particularly instructive for the issues presented in the case before this court, its facts and conclusions are set forth in some detail.  In *McDowell* the court scrutinized section 1983 claims against DeKalb County allegedly resulting from the county's understaffing of its field

---

[10]As the court has already found that the Sheriff and his staff were acting for the county as opposed to the state when providing medical necessities to inmates, the court will analyze claims against the Sheriff and his subordinates acting in their official capacity as claims against Coweta County.  *See Pompey v. Broward County*, 95 F.3d 1543, 145-46 n. 2 (11th Cir. 1996) (resolving official capacity claims as those against the county) .

60

division which was responsible for transporting inmates to medical facilities. In *McDowell*, the inmate was seen and treated at Grady Hospital for back pain on June 5, 1997. The following evening, at 9:30 p.m. on June 6, 1997, Mr. McDowell complained of an inability to urinate and of difficulty walking. At 9:50 p.m. medical personnel decided to have him sent back to Grady Hospital for treatment. When transport to the hospital arrived, it could take only one prisoner, and another prisoner with severe facial trauma was transferred. In the early morning hours of June 7, the field division performed several mental health transports. Mr. McDowell's condition was considered not to be an emergency, and mental health transports were given precedence over non-emergency transports. The morning watch commander notified the jail that his shift could not transport Mr. McDowell and that the transport would be accomplished by the day shift which began at 8:00 a.m. At 8:00 a.m. Mr. McDowell was no longer in the intake area for transport, so the day watch commander told the Jail to inform him when Mr. McDowell was ready for transport. At 9:00 a.m. Mr. McDowell informed an officer that he had no feeling in his legs. Medical personnel determined his condition to be urgent and called an ambulance to take him to the hospital. He was taken by ambulance to Grady Hospital, arriving at 12:20 p.m. At approximately 10:20 p.m. Mr. McDowell was in surgery for a spinal epidural abscess. While the surgery reversed Mr. McDowell's total paralysis, he still remained an incomplete paraplegic.

Mr. McDowell brought suit against DeKalb County under section 1983 arguing "that DeKalb County's custom of understaffing the Sheriff's Office (and the Jail) delayed the

treatment of his condition" and thereby violated his rights under the Eighth Amendment.   The

Eleventh Circuit found that Mr. McDowell had failed to establish that the county's policy,

practice or custom resulted in the violation of his Eighth Amendment rights, as required by

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978).   Here, the court finds the Eleventh

Circuit's reasoning particularly instructive.

In *McDowell,* the court noted that while the Supreme Court has found that counties are

"persons" within the scope section 1983 and subject to liability, counties cannot be held liable

under a theory of *respondeat superior. Id.* at 1289 (citing *Monell*, 436 U.S. at 692).   Rather,

"to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional

rights were violated; (2) that the municipality had a custom or policy that constituted

deliberate indifference to that constitutional right; and (3) that the policy or custom caused

the violation." *McDowell*, 392 F.3d at 1289.

First, relying on *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), the *McDowell*

court noted the standard for establishing municipal liability.   "[A] plaintiff seeking to impose

liability on a municipality under 1983 [must] identify a municipal 'policy' or 'custom' that

caused the plaintiff's injury."   *Wayne*, 197 F.3d at 1105 (quotations and citations omitted).

"A custom is a practice that is so settled and permanent that it takes on the force of law."   *Id.*


"This threshold identification of a custom or policy 'ensures that a municipality is held

liable only for those deprivations resulting from the decisions of its duly constituted

legislative body or of those officials whose acts may fairly be said to be those of the municipality.'" *McDowell*, 392 F.3d at 1290 (citing *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). Such an identification "prevents the imposition of liability based upon an isolated incident." *Id.* "Rather, the incident must result from a demonstrated practice." *Id.* The Eleventh Circuit concluded that "based on these instructions, McDowell must establish that DeKalb's policy was to understaff the field division, and that this practice left the division unable to execute medical transports." *Id.*

The court noted that McDowell could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition." *Id.* Thus, the court deemed this occasion to be an "isolated incident" rather than a "persistent" or "widespread" policy of understaffing the jail so as to delay the transfer of inmates to Grady. *Id.* at 1290-91.

Next, the *McDowell* court analyzed whether the "municipality's action was 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.'" *Id.* at 1291 (citing *Davis ex rel. Doe v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000)). The court found that McDowell could not rely on a generalized policy of understaffing. Rather, he had to show that the County had a "deliberate intent" to inadequately staff the field division. *Id.*

Relying on the Supreme Court's decision in *Brown*, the *McDowell* court found that in a case "where the plaintiff claims that a municipality's facially valid actions violated his

63

constitutional rights . . ., 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *Id.* (citing *Brown*, 520 U.S. at 405). "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Brown*, 520 U.S. at 415 (emphasis in the original). For a municipal action "to meet this burden, a plaintiff must demonstrate that the lawful action was 'taken with deliberate indifference as to its known or obvious consequences.'" *McDowell,* 392 F.3d at 1291 (quoting *Brown,* 520 U.S. at 407). Further, a "showing of simple or even heightened negligence is not enough." *Brown*, 520 U.S. at 407.

Applying this reasoning, the Eleventh Circuit found Mr. McDowell's argument which traced "the County's liability to its failure to properly fund the resources necessary to staff the Jail," to be without merit. *McDowell,* 392 F.3d at 1291 (noting that "the Supreme Court has recognized that inadequate training may impose § 1983 liability on a municipality in 'limited circumstances.'"). "The Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989). The *McDowell* court chose not to extend this liability to inadequate budgeting practices, because the plaintiff did "not identify any 'pattern of injuries' linked to the County's budgetary

64

decisions, nor does he insist that [the county's] accounting practices" were "defective." *Id.* The court noted that "[o]ur precedent does not permit such an attenuated link. If it did, the 'danger that a municipality would be held liable without fault is high.'" *Id*. (citing *Brown,* 520 U.S. at 408). The court found that with the jail's procedures, McDowell could not establish or seriously dispute "that the Board would anticipate that inmates would not receive timely medical attention." *Id.* at 1292. Thus, the court found that the alleged constitutional violation was not a highly predictable consequence of the County's failure to budget and adequately staff the sheriff's office. *Id.*

The last part of the Eleventh Circuit's analysis in *McDowell* involved causation. The County's "deliberate conduct" had to be the "moving force" behind McDowell's injury. *Id.* The Eleventh Circuit noted the Supreme Court warning that "[t]o prevent municipal liability for a . . . decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Brown*, 520 U.S. at 410.

The court found that a County decision that "would make a violation of his constitutional rights 'more *likely,*' was insufficient to 'give rise to an inference that a policy maker's failure to scrutinize the [budget] . . . produced a specific constitutional allegation.'" *McDowell*, 392 F.3d at 1292 (citing *Brown*, 520 U.S. at 411 (emphasis in original)). The court found that "the County's liability cannot be dependent on the scant likelihood that its budget decisions would trickle down the administrative facets and deprive a person of his

65

constitutional rights.  Instead, liability must be premised on a finding that this budget decision was highly likely to inflict the particular injury." *Id.*

To "test the link" between the injury and the County's conduct, the *McDowell* court looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that the injuries were a "plainly obvious consequence" of that decision." *Id.*   The court found that McDowell failed "to demonstrate a genuine issue of fact that the County acted with conscious disregard." *Id.*   The *McDowell* court stated:

> McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not demonstrate that the County was the moving force behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable.  Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before.   To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

*Id.* at 1293.   In analyzing Defendant Coweta County's section 1983 liability in this case, the court finds that the analysis applied by the Eleventh Circuit in *McDowell* is determinative of Plaintiff's contentions.    The first finding necessary to imposition of liability on the county is a violation of Plaintiff's constitutional rights.   The court already has found that Plaintiff has failed to demonstrate that there was a constitutional violation on the part of either Defendant Burnett or Defendant Jennie Adcock.   That finding is determinative of Plaintiff's section 1983

(Rev.8/82)

claim against the county.   Nevertheless, this court looks to the other two things that the Plaintiff must establish prior to an imposition of liability on Defendant Coweta.

Like the plaintiff in *McDowell*, Plaintiff herein has failed to show that any alleged deliberately indifferent policies of Defendant Coweta "contributed to or exacerbated any other inmates' medical condition."   *McDowell,* 392 F.3d at 1290.   Rather, the record leads this court to view the Plaintiff's injuries as an unfortunate but isolated incident.   While Plaintiff asks this court to extend liability to Defendant Coweta on account of its allegedly deficient policies, he has not identified any "pattern of injuries" linked to any of these policies.   None of these policies represents a violation of federal law on its face.   Plaintiff has not met his burden of providing evidence of some sort that Defendant Coweta had a "deliberate intent" to implement inadequate screening policies, allow or encourage an inadequate record-keeping process, implement a policy of inadequate staffing of medical personnel at the jail or have a policy of inadequately training or supervising medical personnel.   As to the last of these, Plaintiff's contention that Defendant Coweta should be held liable for Defendants Yeager, Blake Adcock, Jennie Adcock and Burnett's failure to train or supervise, this contention appears to seek to impose liability based on a *respondeat superior* theory.   Such theory of liability was explicitly rejected by the Supreme Court in *Brown* and the Eleventh Circuit in *McDowell*.   While this court assumes for the sake of the motion before it that the jail (in Coweta County) has an established policy that an inmate cannot be transported out of the county for medical care, Plaintiff has not begun to link any pattern of injuries to such policy.

67

Finally, Plaintiff has not demonstrated a sufficient causal link between the alleged implementation of the County policies under attack and Plaintiff's injuries.  Plaintiff has not provided evidence to show that the County or the sheriff should have known that the Plaintiff's injuries were a "plainly obvious consequence"of the allegedly deliberately indifferent policies he sets forth:  the sheriff's allegedly inadequate screening policies, the jail's inadequate record-keeping process, the jail policy of not transporting an inmate out of the county, [the County's policy] of inadequate staffing of medical personnel at the jail, or of the medical staff's failure to train or supervise.  There is nothing in the record to indicate that any of these alleged policies were the "moving force" behind Plaintiff's injuries.  *McDowell*, 392 F.3d at 1292.  In fact, one of the policies under attack in this case, alleged understaffing, was precisely the type of policy that the *McDowell* court found did not result in liability as to the county defendant.

The Eleventh Circuit in *McDowell*, relying on the Supreme Court's decision in *Brown*, set forth three prerequisites to the imposition of section 1983 liability on a municipality. Because Plaintiff herein has failed to provide sufficient evidence as to any of these prerequisites, the court GRANTS the motion of Defendant Coweta for summary judgment on Plaintiff's section 1983 claims.

**F.      Laboratory Liability**

Plaintiff has posited two theories supporting his claim that Defendants IRL and Emory are liable for his injuries.  First, Plaintiff contends:

68

> [I]n failing to respond to the physician's order for fungus culture with an identification of the yeast isolated from [Plaintiff's] lung specimen which either identified or ruled out both Candida albicans and Cryptococcus neoformans, [Defendant] IRL violated the standard of care for reference laboratories applicable nationally as well as violating their own policies which in fact reflected the accepted standard of care.

Pltf. Resp. to Def. IRL, et al. Mot. for Summary Judgment at 1.  Next, Plaintiff contends that Defendant Emory:

> was negligent in communicating the preliminary results of "yeast not candida albicans" from the hospital laboratory to Dr. Burnett, by simply making the preliminary results of "yeast not candida albicans" available on the Meditech computer system, to which Plaintiff's attending physician Dr. Burnett had full access.  Plaintiff maintains that Defendant Emory Peachtree was obligated to send an individual paper report to Dr. Burnett or somehow call Dr. Burnett's attention to these particular test results by "flagging" the new test results in the electronic report.

Def. IRL, et al Mot for Summary Judgment at 7.[11]  Plaintiff contends that both of these alleged acts of negligence caused delay in Dr. Burnett's initiation of antifungal treatment of Plaintiff's cryptococcus neoformans, which caused injury to Plaintiff, specifically his blindness.

Defendants IRL and Emory contend that they are entitled to summary judgment because (1) there is insufficient evidence that it was beneath the applicable standard of care for Defendant Emory to communicate lab results to physicians by entering the results in the Meditech computer system, and (2) Plaintiff has failed to show that Defendant's allegedly negligent actions caused the Plaintiff's injuries.

---

[11]Plaintiff in his response states that Defendants, in their motion for summary judgment, accurately state his second claim.

69

A plaintiff must establish the following three essential elements to recover in a medical malpractice action: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson,* 276 Ga. 498, 499 (2003). "Expert testimony is also required in simple negligence cases where medical questions are raised that are beyond the common knowledge of a layperson." *Jones v. Orris*, 274 Ga. App. 52, 57 (2005).

Because this court has excluded the expert testimony of Dr. Greifinger and Dr. McGinnis, the court concludes that Defendants IRL and Emory are entitled to summary judgment. Therefore, Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C.'s motion for summary judgment is GRANTED.

### G.    Miscellaneous

On August 1, 2005, Defendant Burnett filed a motion to compel payment pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 37.[12]   Defendant Burnett contends that Plaintiff deposed the experts, Dr. Leonard and Dr. Mellits, on December 20 and December 21, 2004, respectively.   After the depositions Plaintiff did not pay the fees of the deponents despite five

---

[12]Defendant Burnett filed a motion to compel on July 29, 2005.  On August 1, 2005, Defendant Burnett filed a motion to strike the July 29 motion to compel stating that she had not filed the proper brief with the initial motion.  For good cause shown, the court GRANTS Defendant Burnett's motion to strike and STRIKES Defendant Burnett's July 29, 2005 motion to compel.

70

letters from defense counsel informing them of the need to pay such expenses.   Plaintiff counsel's response to defense counsel's last letter stated, "I understand that Tom and I remain indebted to the doctors.   What I don't understand is under what authority you think that Judge Forrester has the authority to force either of us to pay these two doctors?"   After this response, defense counsel filed a motion to compel the payment and for attorney's fees associated with the motion to compel.   After the motion to compel was filed, Plaintiff paid the two doctors' deposition fees.   The only matter that remains before the court is whether Defendant Burnett is entitled to reasonable attorney's fees associated with the motion to compel.

Plaintiff does not contest that he owed the deposition fees.   Rather, Plaintiff contests the grounds for filing the motion to compel and the timing of payment of the fee.   Moreover, Plaintiff states that as of August 1, 2005, he had paid both doctors their deposition fees.

Fed. R. Civ. P. 26 (b)(4)(c) provides that "[u]nless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision."   Thus, in most cases the court will require a party seeking discovery to pay a fee to an expert it deposes.

Fed. R. Civ P. 37 deals in part with failures to cooperate in discovery.   Rule 37 allows a party to ask the court to compel disclosure or discovery and for appropriate sanctions.   Rule 37 contains a good faith requirement in that it requires that a party must attach a certification

71

that the movant has in good faith conferred with the party not making disclosure or discovery.

Further the rule provides:

> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(4)(A).

Here, the court finds that pursuant to the language of Fed. R. Civ. P. 26(b)(4)(C), the court has the power to order the payment of expert fees by a party who deposes an expert. Moreover, the court finds that this obligation is incidental to discovery and therefore within the purview of Fed. R. Civ. P. 37.  The court finds that Defendant Burnett's motion to compel was made after a good faith effort to resolve this matter without the court's intervention.  As payment has already been made to the experts, this matter is now moot.

Remaining before the court is the issue of whether Plaintiff must pay attorney's fees incurred in connection with Defendant Burnett's motion to compel.   There is a strong argument that because  the payment of the fees that are clearly required by Rule 26(b)(4)(C) was made only after the motion to compel was filed, Fed. R. Civ. P. 37 authorizes a court order requiring payment of attorney's fees incurred in conjunction with this motion to

compel.  Nevertheless, given the lack of case law in the area, the ambiguity concerning when expert fees for depositions become due, the fact that the motion to compel does not specifically seek disclosure or discovery, but rather compliance with the Rules, the fact that Plaintiff and his counsel at all times acknowledged the duty to pay these fees, and the fact that this case has not yet gone to trial, the court reluctantly finds that Plaintiff acted with substantial justification in waiting to make payments to the experts.  In doing so, the court in no way encourages delayed payments such as Plaintiff and his counsel made herein. Therefore, the court declines to award attorney's fees to Defendant Burnett in conjunction with her motion to compel.  As there are no remaining matters, the court DENIES AS MOOT Defendant Burnett's motion to compel.

Finally, as Plaintiff in his briefing has explicitly denied wanting a *Daubert* hearing, the court finds no other claims for which oral briefing would help the court.  Therefore, the court DENIES Plaintiff's motion for oral argument.

## III.    Conclusion

The court GRANTSDefendants Coweta County, Mike Yeager, Major Blake Adcock, and Jennie Adcock's motion for summary judgment [143].  The court GRANTS Defendants Coweta County, Mike Yeager, Major Blake Adcock, and Jennie Adcock's motion to exclude the expert testimony of Dr. Robert Greifinger pursuant to Federal Rule of Evidence 702 [146].  The court GRANTS Defendant State of Georgia's motion for summary judgment [148]. The court GRANTS Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C.,

73

and E.C.H.A., L.L.C.'s motion for leave to file excess pages [142].  The court GRANTS Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C.'s motion for summary judgment [150].  The court GRANTS Defendants Integrated Regional Laboratories, E.C.H.A. Peachtree, L.L.C., and E.C.H.A., L.L.C.'s final motion to exclude testimony of Robert Greifinger, M.D., and Michael McGinnis, Ph.D. [151].  The court GRANTS  the motion in limine of Defendants Miriam J. Burnett and MJB Health Services, Inc., to exclude the testimony of Robert Greifinger, M.D. [153].  The court GRANTS Defendants Miriam J. Burnett and MJB Health Services, Inc.'s  motion for summary judgment [154].  The court STRIKES Defendants Miriam J. Burnett and MJB Health Services, Inc.'s motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26, Federal Rule 37 and 28 U.S.C. § 1927 [219].  The court GRANTS Defendants Miriam J. Burnett and MJB Health Services, Inc.'s motion to strike, their motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26 and 37 and 28 U.S.C. § 1927 [220].  The court DENIES AS MOOT Defendants Miriam J. Burnett and MJB Health Services, Inc.'s motion to compel payment of expert deposition fees pursuant to Federal Rule of Civil Procedure 26, Federal Rule of Civil Procedure 37 and 28 U.S.C. § 1927 [221].  The court GRANTS Plaintiff's motion to bring additional authority [188].  The court DENIES Plaintiff's motion for oral argument [189].  The court DENIES AS MOOT Plaintiff's motion to strike [187] reply to response to motion argument I [190].

74

**IT IS SO ORDERED** this 30th day of March 2006.


                                        s/ J. Owen Forrester
                                    J. OWEN FORRESTER
                          SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)